ARTHUR LAWRENCE, Plaintiff-Appellant, *v.* S. E. RUBIO *et al.*, Defendants-Appellees.

Fifth District    No. 79-181

Opinion filed June 26, 1980.

Meyer & Meyer, of Greenville, for appellant.

Cornelius Thomas Ducey, Jr., of Ducey & Feder, Ltd., of Belleville, for appellee Salem Memorial Hospital.

John E. Jacobsen, of Campbell, Furnall, Moore & Jacobsen, of Mt. Vernon, for appellee S. E. Rubio.

Carl W. Lee and Terry N. Brown, both of Gundlach, Lee, Eggmann, Boyle & Roessler, of Belleville, for appellee G. B. Murphy.

Mr. PRESIDING JUSTICE JONES delivered the opinion of the court:

Plaintiff, Arthur Lawrence, brought this malpractice action in the circuit court of Marion County against Dr. S. E. Rubio, a licensed general practitioner, Dr. G. B. Murphy, a licensed radiologist, and Salem Memorial Hospital. Plaintiff appeals summary judgment entered by the trial court for all three defendants as to all counts. The question on appeal is whether the summary judgments were properly granted.

On July 18, 1973, plaintiff stepped into a deep hole, injuring the lower portion of his left leg. He felt a "pop" or "snap" and suspected it was broken. Pain and severe swelling caused him to seek treatment at the Salem Memorial Hospital emergency room the next day. He was treated by defendant Dr. Rubio and a nurse. Dr. Rubio palpated the ankle, tested plaintiff's ability to manipulate the foot and ordered X rays. He interpreted the X rays as normal, showing no bone injury. Dr. Murphy, chief radiologist at the hospital, also interpreted the X rays, reaching the same result. Dr. Rubio concluded the ankle was severely sprained.

Plaintiff was treated by Dr. Rubio in his office on July 21, 24, 27, and 31. Dr. Rubio made no change in his original diagnosis. Plaintiff did not return to Dr. Rubio until September of the following year, when Dr. Rubio diagnosed the injury as a rupture of the Achilles tendon. This diagnosis was later confirmed by Dr. William S. Costen, an orthopedic surgeon.

Plaintiff's amended complaint alleged the treatment provided by each of the three defendants fell short of the requisite standard of care and treatment. The complaint contains so many allegations that a complete detailing here is impractical and unnecessary to the result we reach. The depositions considered by the trial court as part of the motions for summary judgment reveal the following testimony.

Plaintiff Arthur Lawrence testified in his deposition that he told Dr. Rubio at the emergency room that he thought the leg was broken. Dr. Rubio prescribed warm soaks and pain medication; he did not wrap or cast the leg. Dr. Rubio told plaintiff the sprain would take time to heal and that he could return to work. He did not order plaintiff not to use the leg.

Plaintiff testified that when the leg appeared not to be healing, he consulted an attorney, who arranged a September 1974 appointment with Dr. Costen. After examination of the leg and a new set of X rays, Dr. Costen told him the injury was now too old to treat successfully.

Dr. Rubio testified in his deposition that in the emergency room he tested plaintiff's ankle for dorsal flexion, plantar flexion, extension, lateral rotation, and internal and external rotation. He palpated the injured area. He found no "gap" in the Achilles tendon; he did not suspect it was ruptured. There was no apparent contraction or retraction of the calf muscle.

Dr. Rubio testified that he did not request any specific X ray procedure, there being three standard views taken of ankle injuries—"a.p.," lateral, and oblique. All were taken here and all were normal (negative). The films were of "perfect" quality.

Dr. Rubio testified that symptoms of Achilles tendon rupture included extreme pain, a perceptible gap in the tendon, loss of plantar flexion, excessive dorsal flexion, and crimping or bunching of the calf muscles. Dr. Rubio recalled finding normal dorsal and plantar flexion, no gap in the tendon, and no crimping or bunching of the calf muscle (plaintiff testified in his deposition that he did not notice bunching or knotting of muscles in that leg).

Dr. Rubio testified that following the emergency room examination, he prescribed ice packs for the first 24 hours and warm soaks thereafter. During each of the four subsequent office visits, he felt the injured area and tested dorsal and plantar flexion. His nurse soaked and wrapped the

leg each time. Dr. Rubio instructed plaintiff to stay off the leg, stay off work and return for further treatment if needed.

Dr. Murphy testified in his deposition that his duties did not include taking X rays. He stated soft-tissue injuries (injuries other than to bones) are not generally diagnosable by X rays. He speculated that soft tissue diagnosis had become possible within the last year, but he knew of no machine capable of taking such X rays in Illinois at the time of plaintiff's injury (Dr. Rubio testified in his deposition that he was aware of a soft tissue X-ray technique).

David Heavener, administrator of Salem Memorial Hospital, testified in his deposition (only part of which appears of record) that one of two hospital-employed technicians took plaintiff's X rays. He characterized Dr. Murphy as an independent contractor.

Dr. William S. Costen was named by plaintiff as the sole expert witness plaintiff intended to call at trial. Dr. Costen, an orthopedic surgeon licensed to practice in Missouri, testified in his deposition that when he examined plaintiff in November of 1974, the left calf was smaller than the right. There was a palpable defect behind the left ankle, Dr. Costen being able to place a finger "well toward the bones." Dorsal and plantar flexion were satisfactory, but plaintiff could not stand on his left toes.

Dr. Costen testified that he had three X-ray views taken of plaintiff's ankle—"a.p.," lateral, and oblique (the same views taken at Salem Memorial Hospital). They showed no abnormality other than a small bone spur. Dr. Costen stated he would have taken the same views, and no others, on the date of plaintiff's injury. He would also have performed a clinical examination; he would not have performed any other diagnostic procedure.

Dr. Costen testified that his examination indicated an "old tear" of the Achilles tendon, discoverable only by clinical examination. X rays would not show such an injury, since X rays do not normally show soft tissue.

Dr. Costen testified that a rupture of the Achilles tendon is "very difficult" to feel through the swelling usually accompanying such an injury. It would not be unusual to miss it for a week to 10 days by not pushing hard enough to feel the gap in the tendon. Such diagnosis would be difficult even for an orthopedic surgeon "but we should not miss it * * *. If you see a few of these it is almost a telephone diagnosis." Asked whether a diagnosis by a general practitioner of an ankle sprain, where the ankle was swollen, would be contrary to the diagnosis other general practitioners might make under similar circumstances, Dr. Costen replied that it would not.

Dr. Costen answered several hypothetical questions posed by Dr.

Rubio's attorney and based on facts similar to those in this case. None of those answers indicated that he felt the procedures followed by Dr. Rubio were not usual and customary for a general practitioner.

The three defendants moved separately for summary judgment. Plaintiff filed a brief in opposition to the motion by the hospital and an affidavit and exhibit in opposition to the motions by Dr. Murphy and Dr. Rubio. The affidavit by Dr. Costen stated Dr. Rubio had misdiagnosed plaintiff's injury, resulting in "50 percent permanent functional impairment" of the left leg. The exhibit was a letter by Dr. Costen in which he stated to plaintiff's attorney that Dr. Rubio's diagnosis was incorrect.

The motion for summary judgment by Salem Memorial Hospital was granted after a hearing. No written judgment appears of record. After another hearing, the motions for summary judgment by Dr. Murphy and Dr. Rubio were also granted. The trial court stated in a written judgment the findings that (1) the X rays were of good diagnostic quality and properly interpreted and would not show the Achilles tendon injury, and the same type would have been taken by plaintiff's expert, and (2) treatment of plaintiff following his accident was the usual, ordinary, and expected treatment for a general practitioner given the nature of the injury presented, and there was nothing unusual in the general practitioner's findings.

■■ Summary judgment shall be rendered on motion if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that movant is entitled to judgment as a matter of law. (Ill. Rev. Stat. 1977, ch. 110, par. 57(3).) This court's view of summary judgment is expressed in *Sanders v. Frost* (1969), 112 Ill. App. 2d 234, 238, 251 N.E.2d 105, 106, in pertinent part as follows:

> " 'The purpose of summary judgment proceedings is to determine whether there is any genuine triable issue of fact which must be passed upon. [Citation.] If the pleadings, discovery depositions and exhibits, present a genuine issue as to any material fact, summary judgment should not be granted. [Citation.] The right of the moving party to summary judgment must be free from doubt.' "

Even though a complaint and answer may purport to raise issues of material fact, if such issues are not further supported by evidentiary facts through affidavits or such, summary judgment is then appropriate. (*Carruthers v. Christopher* (1974), 57 Ill. 2d 376, 313 N.E.2d 457.) If the party moving for summary judgment supplies facts which, if not contradicted, would entitle movant to judgment as a matter of law, the

opposing party cannot rely upon his complaint or answer alone to raise genuine issues of material fact. (*Carruthers v. Christopher.*) With these tenets in mind, we examine plaintiff's contention that all three motions for summary judgment were improperly granted.

■■ Considering first Dr. Rubio, we believe no substantial question of fact as to his liability remains. The depositions and the affidavit filed below indicate no basis whatsoever on which Dr. Rubio could be found negligent. One element of a cause of action for medical malpractice is ·proof of the standard of care by which the defendant physician's conduct is to be measured. (*Chamness v. Odum* (1979), 80 Ill. App. 3d 98, 399 N.E.2d 238.) In a malpractice action a physician will be held responsible for injuries resulting from his want of reasonable care, skill and diligence in his practice. The plaintiff must prove by affirmative evidence that the defendant was unskillful or negligent and that his want of skill or care caused injury to the plaintiff. (*Sanders v. Frost.*) Generally it is necessary for plaintiff to show by expert testimony not only that injury occurred, but that such event does not ordinarily occur in the normal course of events without negligence. (*Sanders v. Frost.*) Mere proof that the defendant doctor made a mistake or that his treatment harmed plaintiff is no evidence of lack of skill or negligence. *Sanders v. Frost.*

Here it was incumbent upon plaintiff to show in his depositions and affidavits that he could present expert testimony indicating the care provided by Dr. Rubio was less than ordinary care. This plaintiff failed to do. Plaintiff named Dr. Costen as the only expert witness he intended to call at trial. He did not allege that other expert testimony more favorable to his theory of the case was forthcoming. Yet Dr. Costen's deposition testimony was uniformly favorable to Dr. Rubio. According to Dr. Costen, Dr. Rubio's ordering and interpretation of the X rays was usual and normal. Palpation of the left ankle and checking dorsal and plantar flexion was described by Dr. Costen as normal procedure for a general practitioner. Dr. Costen viewed prescription of rest and warm soaks as acceptable advice.

It should be noted that Dr. Costen's testimony indicated that misdiagnosis of an Achilles tendon rupture by an orthopedic surgeon would of itself amount to negligence. Dr. Costen's testimony, however, also established that he believed a significantly lower standard was appropriate in measuring the adequacy of treatment provided by a general practitioner. We think Dr. Costen's testimony showed misdiagnosis under the instant circumstances was entirely excusable, and not negligent, for a general practitioner such as Dr. Rubio.

We note Dr. Costen's sworn statement in plaintiff's affidavit in opposition to the motions for summary judgment, that Dr. Rubio

misdiagnosed the injury, resulting in permanent disability. This was not sufficient to raise an issue of fact as to Dr. Rubio's negligence; still lacking from plaintiff's case is a showing that Dr. Rubio fell short of the requisite standard of care.

Plaintiff urges that Dr. Rubio was negligent in failing to have plaintiff bear weight on the injured leg or try to stand on his toes. There is no basis in Dr. Costen's testimony to infer that such tests were necessary to proper diagnosis or that failure to conduct those tests rendered Dr. Rubio's treatment less than adequate. Plaintiff asserts Dr. Rubio admitted these were proper tests he did not perform. We find no indication that Dr. Rubio believed he was negligent in failing to perform those tests.

Plaintiff also emphasizes testimony referring to a soft tissue X ray technique. There is no indication that such technique was available in July 1973. All indications of record are to the contrary. There is no suggestion that failure to order such X rays rendered Dr. Rubio's treatment inadequate. We find no issue here.

■■ In conclusion, we think the trial court properly found that Dr. Rubio's treatment and diagnosis were "usual, ordinary, and expected." We will not disturb that finding or the trial court's summary judgment in favor of defendant Dr. Rubio.

■■ Second, we consider whether summary judgment for defendant, Dr. Murphy, the radiologist, was proper. Dr. Murphy's association with plaintiff was limited to interpretation of his X rays on the date of the emergency room visit. Dr. Murphy testified that he neither examined plaintiff nor ordered X rays. He merely checked the X rays for signs of bone injury. His conclusion that no bone injury appeared was echoed by plaintiff's expert, Dr. Costen. There is no indication that the X rays were so poor that Dr. Murphy should have ordered a new set; Dr. Murphy's testimony that they were satisfactory is uncontradicted. Dr. Costen stated plaintiff's injury was discoverable only by clinical examination. The trial court's finding that the X rays were properly interpreted being compelled by uncontradicted expert testimony, we find no reason to disturb that finding or the summary judgment in favor of defendant, Dr. Murphy.

Third, we consider whether summary judgment in favor of defendant, Salem Memorial Hospital, was proper. We confine our consideration to the date of plaintiff's emergency room visit, the only relevant time plaintiff was treated at the hospital. Also, we need not determine whether the hospital was responsible for the negligence of Dr. Rubio and Dr. Murphy as we have determined neither doctor was negligent.

■■ The hospital did not treat plaintiff. All treatment was provided by Dr. Rubio. While a hospital nurse was present, the nurse was under Dr.

Rubio's direction. Hospital technicians made the X rays, but there was no indication that the X rays were unsatisfactory. We conclude that summary judgment was properly granted for defendant Salem Memorial Hospital.

Affirmed.

KARNS and KASSERMAN, JJ., concur.